UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| THOMAS EDWARD OTT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 1:03-cv-1413-JDT-WTL |
| ) | |
| EDINBURGH COMMUNITY SCHOOL ) | |
| CORPORATION, and REBECCA SAGER ) | |
| and DALE BOWERS, individually and in ) | |
| their official capacities, ) | |
| ) | |
| Defendants. ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**[1]

For about a decade of his life the Plaintiff, Tom Ott, was in and out of criminal troubles. It started in 1979 with a simple marijuana possession conviction and progressed through the 1980s with convictions related to his use and possession of marijuana as well as his abuse of alcohol. His criminal troubles peaked with and abated following his pleading guilty in Indianapolis to the felony of conspiracy to deal marijuana in May of 1990. He was never sentenced to prison, but did receive a four- year suspended sentence for the felony and was kept on probation for more than five and one-half years as a result of all his various convictions.

By 2001, Ott had completed the required four years of probation following his felony conviction and was living with his wife in Las Vegas, Nevada. Ott apparently

---

[1] This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

successfully had overcome his criminal past, as he and his wife were both employed and buying a home in a gated community in Las Vegas. However, their life was about to be changed significantly as a result of an Indiana high school football program that had not won a game in over three years and the school corporation's search for a football coach to turn the program around. Ott had always wanted to coach a high school football team in his home state of Indiana. He had obtained a sufficient number of hours at the University of Nevada at Las Vegas to allow the Indiana Professional Standards Board to issue him a standard teaching license in his college major of physical education. So, in 2000 he had applied for employment with Edinburgh Community School Corporation ("ECSC"). He was interviewed by the ECSC board in April of 2001 and offered a position as the varsity football coach in May of 2001.

During the course of his interview and through a packet of information given to the board members, Ott conveyed at least two messages. First, he let the board know he had been convicted of several marijuana and alcohol-related offenses in the past, but opined that he had turned his life around. Second, he made sure that the board knew that he could not afford to leave the relative stability he had in Las Vegas for only the approximately $4,500 that would come with the football coaching position. He would need to be employed with the school corporation in some additional capacity or with another employer to assure an adequate income. He also believes he made it clear that he and his wife would quit their jobs and sell their home only if there was a long-term commitment of sorts to allow him to succeed. However, he admits that no promise of any term of employment was given to him either at the interview or when he was

offered the job, nor was there a promise of any employment in addition to the football coaching position.

Ott accepted the football coaching position within a couple days of the offer. He did so with the understanding that he would need to find additional employment. In the summer of 2001, ECSC offered Ott a position as a special education teacher as well as an assignment as the girls varsity basketball coach. Because Ott's general teaching license was for physical education only, the Superintendent of ECSC had to apply for a limited license which would allow Ott to teach in the special education area for a single academic year. Ott had been working on obtaining sufficient hours to attain licensure for special education while in Nevada and would continue that effort in Indiana. In order to obtain the limited license, the Superintendent had to certify that the district was unable to find an applicant with a valid special education teaching license. The application for the limited license was submitted on August 6, 2001, the same day Ott was offered and executed a written contract for the 2001-2002 academic year to serve in both coaching capacities and as a special education teacher for the total sum of $37,665.[2] On August 8, 2001, the application for a limited license was approved and Ott received a license to teach special education at ECSC through June 30, 2002.

Ott was able to lead the football team to two victories during the 2001 season and received high marks from the athletic director regarding his performance as a coach during the course of the school year. However, Ott's past was about to resurface as a

---

[2] A second contract covering the same positions and the same time frame, but including a slight increase in pay, was offered and executed in January of 2002.

bone of contention.  In April of 2002 ECSC hired Defendant Rebecca Sager to serve as its Superintendent.  Three days prior to actually assuming the responsibilities as Superintendent, she met with Defendant Dale Bowers, a board member, who provided Sager with Ott's arrest record.  Despite his having interrupted Ott, during Ott's attempt to explain the nature of his criminal history at his initial interview, to indicate that Ott's criminal history was not at issue, Bowers later requested that a local police officer obtain the criminal records after receiving an anonymous telephone call regarding Ott's past drug arrests.  Sager was not pleased to learn from Bowers that Ott had several past arrests or that he had been convicted of a drug-related felony.  Shortly after taking the reigns as Superintendent, she went to the principal of the high school, David East, put Ott's criminal record in front of him, and indicated that Ott should resign before his past record was made public.  East telephoned Ott to inform him of Sager's contention, but Ott refused to resign.

At the April 29, 2002 school board meeting, Sager recommended the non-renewal of Ott's teaching contract.  On April 30, 2002, Ott was notified that his contract as a special education teacher would not be renewed for the following school year.  Had there been an intent on the part of ECSC to retain Ott in the same position, there would have been a need to obtain another limited license through the same procedure as the Superintendent had pursued the previous year.  In the summer of 2002 ECSC received applications from four qualified and licensed special education teachers.  In July, Sager recommended an individual to the board to fill the special education position, but that person was not offered the position.  In the end, because there were only two students

remaining in the program who could be absorbed into other curricula, economic considerations caused SCSC to cease the program in its entirety prior to the start of the 2002-2003 academic year. That decision was made pursuant to the recommendation of Sager at a special board meeting held at the end of July.

In August of 2002 the board held a special executive session to discuss Ott's continued employment with ECSC. During the course of that executive session, which was attended by Ott, Sager related that she had received complaints from staff members regarding "verbally aggressive behavior" or "verbal abuse" on the part of Ott. Eventually the discussion centered around Ott's criminal past, with Sager making it clear that she felt a convicted felon should not be teaching children within ECSC. Two days later an open meeting was held where members of the public were allowed to comment on Ott's continued employment with ECSC. By this time, local and regional media had picked up on the story of Ott's criminal past and Sager's effort to convince the school board not to continue his employment. Five days after the meeting for public comment, the board met in regular session and voted to terminate Ott's position as girls basketball coach effective immediately and as football coach immediately following the 2002 season. As a condition to remaining on through the 2002 football season, Ott was required to submit to an immediate drug test followed by bi-weekly testing. He was also subject to immediate termination for any verbal abuse of staff members.

On August 17, 2002 while at school, Ott tripped over a piece of carpeting wedged in a doorway and injured his back. After initial bed-rest failed to relieve his pain, it was determined that Ott was in need of surgery. As a consequence of the injury and

required surgery, Ott and his doctor believed that if he attempted to continue his football coaching responsibilities it would threaten his recovery. Therefore, Ott submitted a letter of resignation from his position as varsity football coach on September 6, 2002.

Ott has filed a seven count complaint against ECSC, Sager and Bowers. He has set forth the following theories of recovery:

> Count I - Denial of Equal Protection under 42 U.S.C. § 1983
> Count II - Denial of Due Process under 42 U.S.C. § 1983
> Count III - Violation of the Family and Medical Leave Act ("FMLA")
> Count IV - Breach of Contract
> Count V - Breach of Covenant of Good Faith & Fair Dealing
> Count VI - Defamation
> Count VII - Intentional Infliction of Emotional Distress

The Defendants have filed a Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56, claiming they are each entitled to judgment as a matter of law on all seven of the theories advanced by Ott. For the reasons discussed in this entry, the court agrees that the Defendants are entitled to summary judgment.

### *Summary Judgment Standard*

Summary judgment is to be granted only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court examines the pleadings and the proof as presented in depositions, answers to interrogatories, admissions, and affidavits made a part of the record. *First Bank & Trust v. Firstar Info.*

*Servs. Corp.*, 276 F.3d 317, 322 (7th Cir. 2001).  It also draws all reasonable inferences from undisputed facts in favor of the non-moving party and views the disputed evidence in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  However, pursuant to the Local Rule 56, for purposes of deciding the motion for summary judgment, the court will assume that the facts set forth and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are specifically controverted by the opposing party and supported by appropriate citation to the record.  The non-moving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather he must go beyond the pleadings and support his contentions with properly admissible evidence.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  Only competing evidence regarding facts that might affect the outcome of the suit under the governing law will preclude the entry of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  And, if the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment is properly granted to the moving party.  *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

### *Analysis*

The first claim Ott asserts is the denial of equal protection of the laws in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution and actionable under 42 U.S.C. § 1983.  To state a prima facie case under the equal protection clause, a plaintiff must demonstrate that he: (1) is a member of a

protected class; (2) is otherwise similarly situated to members of the unprotected class; (3) suffered an adverse employment action; (4) was treated differently from members of the unprotected class; and (5) the defendant acted with discriminatory intent. *McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 564 (7th Cir. 2000). Recognizing that he does not fall within one of the traditionally recognized protected classes, Ott attempts to invoke the "class of one" exception recognized in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). In *Village of Willowbrook* the Supreme Court validated the Seventh Circuit's recognition that a cognizable claim under the equal protection clause could be maintained by any individual, or a "class of one," if the allegation is that the state has taken action against him and not others in a spiteful effort devoid of any legitimate state objective. *Id.* at 563-564. In support of the claim he raises in Count I, Ott maintains that he was singled out without reason for drug testing, contract cancellation, and false allegations of verbal abuse. However, as to each, there is either no evidence of record to support his argument or a legitimate objective supports the conduct of which he complains.

First, there is no evidence of record to suggest that Sager's report to the board that she had received complaints from certain staff members regarding the manner in which Ott verbally addressed them was false. Just because Ott submits an affidavit from his principal indicating the principal had not witnessed any verbal abuse and an affidavit from the athletic director indicating Ott got along with staff well, does not mean that Sager did not receive such complaints. There is no inherent contradiction; and, certainly no first hand evidence that would contradict Sager's statement.

Next, the requirement that an employee submit to a drug test may or may not be an adverse employment action as that term is generally thought of in civil rights actions. *See Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001-1002 (7th Cir. 2000) (requirement of drug testing found not to be adverse employment action under circumstances). Regardless, even under an assumption that the testing was an adverse employment action, there is no question here that a legitimate objective existed for requiring Ott to submit to a drug test. He was convicted of both using and conspiring to deal a controlled substance. And, while the previous Superintendent may have seen the ten years passing without subsequent arrest as a reason not to require drug testing, Sager's adoption of a more stricter monitoring requirement can hardly be said to be outside the bounds of reason. Ott can point to no other coaches or teachers who were known to have been similarly convicted of drug crimes and who were not required to submit to drug testing. Sager "makes no bones" about the reason why she required the drug testing. It is Ott's history of drug offenses. Since no federal law prohibits a school district from establishing a policy barring the hiring of any convicted drug felon as a coach or teacher, it would seem incongruous then to bar it from drug testing one who they did choose to hire. *See Hilliard v. Ferguson*, 30 F.3d 649, 652 (5th Cir. 1994) (only a rational basis is required for a school system's policies regarding the hiring of convicted felons).

As to Ott's argument that he was singled out for non-renewal of his teaching and coaching contracts, Ott offers no persons similarly situated who were treated more favorably. In short, his contract was for a year, with a temporary teaching certification that expired at the end of that year. The Superintendent could hardly certify to the state that for the upcoming year she had no qualified applicants for the position Ott had previously been given a limited license to fill when, in fact, four qualified applicants had sought the position. Moreover, there is no question that, in the end, the special education program was completely eliminated prior to the next academic year. Ott had no basketball coaching contract for the next year, and he resigned from the football coaching position, which was the only position the board had agreed to allow him to serve in during that academic year.

Ott next argues that his constitutional right to due process has been violated. However, his lack of a contract with the school district bars him from recovery under a denial of due process theory. Simply stated, Ott was not working as a permanent teacher and by statute had only the right to written notice of non-renewal, which he did receive. Ind. Code § 20-6.1-4-14. Unless a public employee has been conferred a right to continued employment through a law, express promise or some type of representation from which it could be reasonably inferred that such a right existed, the state does not deprive the employee of a property right when his employment is not continued. *Pleva v. Norquist*, 195 F.3d 905, 914 (7th Cir. 1999). The Fourteenth Amendment due process clause certainly does not guarantee a high school coach that he will continue in the position absent good cause. *Smith v. Bd. of Educ. of Urbana*

*Sch. Dist. No. 116,* 708 F.2d 258, 261 (7th Cir. 1985). Ott makes much in his deposition about clarifying at his interview that he expected his employment would be for an extended period of time. However, he readily admits that no promise of anything other than a one-year contract to be the football coach at the high school was made. If Ott required a greater commitment in order to leave Las Vegas, he should have secured it in some form. Without such a commitment on the part of ECSC, no due process violation as alleged in Count II has occurred.

Count III alleges a violation of the FMLA. There are no facts to support any such claim. Ott argues that Sager's direction to the athletic director to send a mobile drug-testing unit to Ott's house, after he was injured, somehow violated the FMLA. Yet, Ott cites to no particular provision of the law and the court certainly knows of none which was violated by the action. He also seems to suggest that he was entitled to FMLA leave following his injury. However, Ott did not give any indication that he sought medical leave after his injury. While an employee need not have knowledge of the particular benefits he may be entitled to under the act to qualify, he must provide the employer with sufficient information to allow it to determine that FMLA qualified leave is needed. *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 616 (7th Cir. 2001). There is no evidence of record that Ott provided any such information. In fact, he declined to make a worker's compensation claim and resigned as varsity football coach, giving every indication that he was giving up on the obvious conflict between he, Sager, and certain members of the board regarding the propriety of his continued

employment with ECSC in any capacity.  In any event, the circumstances do not give rise to an FMLA claim.

Ott did have a contract with ECSC.  The problem with his claim of contract breach in Count IV is that the contract had expired and ECSC provided him with the notice of non-renewal that was appropriate under state statue.  Ind. Code § 20-6.1-4-14.  Ott was not a permanent or semi-permanent teacher under Indiana's statutory tenure provisions.  Ind. Code §§ 20-6.1-4-9, -9.5.  Consequently the "good cause" requirements for cancelling or non-renewal of permanent teacher contracts did not apply.  Ind. Code § 20-6.1-4-10.  In addition, Indiana recognizes the duty of good faith and fair dealing in connection with contracts in only a few limited settings where the parties' intentions cannot be readily ascertained, where there is a fiduciary relationship, or where an insurance contract is involved.  *See Beacham v. Macmillan, Inc.*, 837 F. Supp. 970, 975 (S.D. Ind.1993); *First Fed'l Savs. Bank of Ind. v. Key Markets, Inc.*, 559 N.E.2d 600, 604-05 (Ind. 1990).  Here, in addition to there being no question that Ott's contract was for a period of one year, the state legislature has prescribed what the school corporation's obligation is with respect to non-renewal of the contract.[3]

---

[3] With the demise of Ott's federal claims, there is a presumption that the supplemental state law claims (28 U.S.C. § 1367) should be dismissed without prejudice.  However, as the court already has invested substantial judicial resources in this case and believes that the outcome of the claims is clear, it would make little sense to send the litigants to state court for further proceedings, and this court declines to do so.  *See Lawrence v. Kenosha County*, 391 F.3d 837, 844 (7th Cir. 2004) (decision to retain jurisdiction over state law claim was appropriate where court granted summary judgment on federal claims and state claim was barred by governmental immunity); *Brazinski v. Amoco Petrol. Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993) (if the correct disposition of a supplemental claim is "so clear as a matter of state law and can
(continued...)

Consequently, Ott's claim in Count V of a breach of the implied contractual duty of good faith and fair dealing fails as well.

Defamation is the next theory of recovery advanced by Ott. He argues that the "release" of his criminal history by Sager and Bowers amounted to defamation. Leaving aside the question of what evidence supports the notion that the two Defendants "released" Ott's criminal history, there is no question that Ott himself was the first to reveal his criminal history at his initial interview. He made it an issue. The fact that others involved in the administration of the school district later developed a difference of opinion as to whether that history constituted a basis to restrict or bar Ott's involvement with students does not somehow shift the responsibility for "publication" of the information from his criminal history from him to those individuals. More importantly, in Indiana truth is an absolute defense to a claim of defamation or slander, unless it involves a racial epitaph. *N. Ind. Pub. Serv. Co. v. Dabagia*, 721 N.E.2d 294, 307 (Ind. Ct. App. 1999). Ott has admitted the truth of all that has been submitted as his criminal history, negating any hope of recovery under Count VI of his Complaint. Moreover, the facts of conviction and arrest are public events for which public records exist. Ott suffered no undue disclosure of these public facts.

---

[3](...continued)
be determined without further proceedings and without entanglement with any difficult issues of state law, considerations of judicial economy warrant[] retention and decision rather than relinquishment of the case to state court.") This also applies to Counts V, VI and VII.

That leaves Count VII and Ott's claim of intentional infliction of emotional distress. To be liable for intentional infliction of emotional distress a person must, by outrageous conduct so extreme as to be utterly intolerable and beyond all possible bounds of decency, intentionally or recklessly cause severe emotional distress to another. *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991) (adopting Restatement (Second) of Torts § 46 (1965)). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Inlow v. Wilkerson*, 774 N.E.2d 51, 55 (Ind. Ct. App. 2002) (quotation omitted). "'[L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Gable v. Curtis*, 673 N.E.2d 805, 810 (Ind. Ct. App. 1996) (quoting Restatement (Second) of Torts § 46). Indiana courts have said that the "requirements to prove this tort are 'rigorous.'" *Creel v. I.C.E. Assocs.*, 771 N.E.2d 1276, 1282 (Ind. Ct. App. 2002). For its part, the Seventh Circuit has observed that the "Indiana courts have been reluctant to award damages for intentional infliction of emotional distress in employment cases." *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1167 (7th Cir. 1998).

Ott alleges that Sager's and Bowers' conduct caused him significant emotional distress. Giving him the benefit of all reasonable inferences, he had a right to feel as though the rug was pulled from beneath him. However, even viewed in a light most favorable to Ott, Sager's and Bowers' conduct is simply insufficient to satisfy the rigorous standards for the tort of intentional infliction of emotional distress. Regardless

of their refusal to give much if any weight to the board's original decision that Ott was suitable to serve as a coach and teacher, Sager's and Bowers' conduct in campaigning for his removal was not so outrageous in character, or so extreme in degree as to shock the conscious of anyone.  To suggest otherwise would be to ignore the existence of the very issue at the heart of this controversy, that is, whether or not after ten years without a subsequent arrest, a convicted drug felon is a suitable teacher and coach for high school age children.  It is a question without a simple answer.  Luckily, this court is not being asked to answer that question in this litigation, but its existence is undeniable, and it serves as a legitimate basis for the actions taken by the Defendants which may have caused Ott severe emotional distress.

*Conclusion*

Tom Ott is upset and, perhaps, justifiably so.  He believed his honesty in bringing up his criminal past, as significant as that past was, had led to his obtaining a job he liked and wanted to keep for some time.  But there was no promise made to him by ECSC with regard to the length of time he would be allowed to serve as coach or teacher.  He secured only a one year commitment, and at the end of that year, the circumstances at hand, including who held influential administrative positions and the opinions of those in charge, had changed.  When examined in a manner that gives Ott the benefit of all doubts, he may have gotten a raw deal.  However, even looking at the circumstances with that perspective, there was nothing unlawful about what happened and no Defendant took any action which would leave that Defendant liable to Ott for any

damages. No material question of fact remains and the Defendants are entitled to judgment as a matter of law.

The Defendants' Motion for Summary Judgment (dkt. no. 29) will be **GRANTED**. Final judgment will be entered in favor of the Defendants.

ALL OF WHICH IS ENTERED this 31st day of October 2005.

_____
John Daniel Tinder, Judge
United States District Court

Copies to:

Steven D. Groth
Bose McKinney & Evans
sgroth@boselaw.com

Bobby Allen Potters
Potters Law Firm
bpotters@aol.com